J-A16017-24

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                       :             PENNSYLVANIA
                                         :
             v.                           :
                                         :
                                         :
CHARLES PAUL ETLING                :
                                         :
           Appellant                :      No. 1258 WDA 2023

Appeal from the Judgment of Sentence Entered April 18, 2023
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0001469-2020

BEFORE: KUNSELMAN, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY MURRAY, J.:                  **FILED: JULY 23, 2024**

Charles Paul Etling (Appellant) appeals from the judgment of sentence imposed after a jury convicted him of one count each of aggravated assault, strangulation, and recklessly endangering another person (REAP).[1] We affirm.

The trial court summarized the Commonwealth's evidence at trial:

On the morning of June 12, 2020, [Debbie] Scott [(Scott)] looked out of the living room window of her home on Meadowbrook Lane in rural Mount Pleasant Township, Westmoreland County. ([N.T., 1/18/23, at] 39:5-6). She became concerned when she saw her eighty-year-old uncle trying to climb down from a moving lawn tractor. (*Id.* at 39:17-18.) She grabbed her phone and ran outside. (*Id.* at 40:3.) Her uncle screamed at her to call 911, and she did. (*Id*. at 40:1.) From her porch, Scott saw a woman "dragging herself across the front lawn." (*Id.* at 40:4-5.) Her uncle helped the woman, … Amber Kachmarek [(Kachmarek)], onto the porch. (*Id.* at 40:16.) Scott reported that the woman's lips were parched and swollen; her hair was matted with briars, twigs, blood and mud; her eyes were swollen shut; and her face

_____

[1] 18 Pa.C.S.A. §§ 2702(a)(1), 2718(a)(1), 2705.

was covered with mud and blood from a large gash on the left side of her face. (*Id.* at 40:20-24.) Wearing only a muscle shirt, the woman asked Scott if she knew who had stolen her pants. (*Id.* at 41:6-7.) The police arrived soon thereafter. (*Id.* at 43:20.) … [T]he Commonwealth introduced a photograph into evidence that corroborated [Scott's] description of the woman's facial injuries….

[Kachmarek] testified that she started dating [Appellant] soon after they met on July 4, 2018. (*Id.* at 48:8-10, 17-18). They moved in together in November 2018. (*Id.* at 48:20-21). At some point during their relationship, [Appellant] and Kachmarek began using methamphetamine. (*Id.* at 50:20-23). She testified that as a result, their formerly "great" relationship turned abusive. (*Id.* at 48:24, 50:24). Kachmarek testified about multiple incidents of domestic violence that occurred in the months prior to the incident on June 11, 2020. (*See* [*id.* at] 54:12-25, 58:1-25, 59:1-25, 61:10-25, 62:2-3). After the third incident that occurred on March 30, 2020, she left [Appellant] and moved into a local women's shelter. (*Id.* at 61:1-2). However, she returned to [Appellant] after only one week [at the shelter]. (*Id.*)

On June 11, 2020, in an effort to save their relationship by moving away from the area, [Appellant] and Kachmarek drove to West Virginia to put a deposit down on a rental home. (*Id.* at 63:13-18). On their way back to M[ount] Pleasant, Kachmarek noticed a change in [Appellant's] mood. (*Id.* at 65:20). He accused her of exposing his daughter to drug dealers and sex and then began hitting her. (*Id.* at 58:1-3). He pulled his truck to the side of the road and, using both hands, began to strangle her. (*Id.* at 69:1-2). As she tried to fend him off, [Appellant] grabbed her hair and pulled her out of the driver's side door of the truck. (*Id.* at 69:3-5). She recalled falling onto the ground on her knees. (*Id.* at 69:8-11). She attempted to get up and run, but [Appellant] grabbed her by the throat and raised her off the ground. (*Id.* at 70:4-11). With his hands around her neck, [Appellant] held her above his head and cried, "Why are you making me do this to you?" (*Id.*) Eventually, she felt everything become "black and quiet." (*Id.* at 70:11-12). As her head fell backward and her feet stopped kicking, she said she felt "at peace." (*Id.*) She lost consciousness, woke up sometime afterwards, and started running. (*Id.* at 77:13-14). Because it was dark, she did not know where she was—only that she was running in a creek bed. (*Id.* at 78:6-7). She eventually crawled

out, lay down in the tall grass, and fell asleep. (*Id.* at 78:10-14). Kachmarek testified that when she awoke, she was wearing only a bra, underwear, and a tank top. (*Id.* at 78:17-19). Through her swollen eyes, she was able to see the outline of a man on a tractor. (*Id.* at 79:8-9). She waved her hands to get his attention and then asked him to take her to the hospital. (*Id.* at 79:21-22). After the police arrived, she was taken to Westmoreland Hospital. (*Id.*)

Trial Court Opinion, 9/25/23, at 2-3.

The trial court described the evidence of Kachmarek's injuries:

After undergoing multiple tests and receiving stitches for her facial lacerations, Kachmarek was discharged [from the hospital]. ([N.T., 1/18/23,] at 80:21). While in the hospital, she complained mostly about her painful tongue, which she had bitten in multiple places. (*Id.* at 80:24-25). The next morning, her entire face hurt, especially the area around the sutured wound above her eye. (*Id.* at 81:8-9, 82:15-18). [Kachmarek's] sister had to help her shower, brush her hair, and take her medicine. (*Id.* at 81:14-16). Her legs and arms were covered in scratches from crawling over brush. (*Id.* at 83:9-10). Two weeks later, the facial swelling and bruising was still noticeable. (*Id.* at 84:24-25). Her eye remained tender "for a long time." (*Id.* at 84:25, 85:1-2). She underwent elective surgery on her fac[e] to cover the scar above her eye. (*Id.* at 127:24-25). At the time of the trial, [Kachmarek] was still receiving mental health therapy to cope with the trauma. (*Id.* at 85:15-19)….

[Dr. Susan Caslow, M.D., testified she] was on duty on June 12, 2020[,] when Kachmarek was brought into Westmoreland Hospital's Emergency Room. (*Id.* at 147:18-19). [Dr.] Caslow noted that [Kachmarek] was covered in caked mud, dirt and other debris. (*Id.* at 150:12-13). Her face was swollen and bloody from a laceration to the side of her face. (*Id.* at 150:20-21). Even the whites of her eyes were bloody. (*Id.* at 150:22-23). All of her extremities were covered in scratches. (*Id.* at 151:7-8).

Trial Court Opinion, 9/25/23, at 4.

The Commonwealth presented testimony from two Pennsylvania State Police Troopers regarding their investigation:

Trooper Michael Thompson testified … [that, i]n the early morning hours of June 12, prior to Kachmarek having been discovered …, [Trooper] Thompson received information that Kachmarek was missing and that [Appellant] might know what happened to her. ([N.T., 1/18/23,] at 157:20-25). [Appellant] came to the State Police barracks and admitted that he had assaulted and, to his knowledge at the time, possibly killed Kachmarek. He then disposed of her body in the woods. (*Id.* at 156:10-13, 157:15-25, 158:1). With no objection from [Appellant], the Commonwealth offered into evidence … [Trooper] Thompson's taped interview with [Appellant]. (*Id.* at 159:23-24)….

Trooper Evan Terek testified that[, before Kachmarek's discovery,] he had also been assigned to Kachmarek's missing person investigation. ([N.T., 1/19/23, at] 5:14-16). After performing a general neighborhood canvas to locate her, he received a radio dispatch that she had emerged from the woods on Meadowbrook Lane, severely injured. (*Id.* at 9:3-8). He and Trooper Troy Falk traveled to the Scott residence to meet with Kachmarek. (*Id.* at 9:7-8). When he arrived, he observed that [Kachmarek] could barely keep her eyes open. (*Id.* at 10:7-8). Her facial injuries were significant. (*Id.* at 10:11-12). She was partially nude and covered in scratches and blood. (*Id.* at 10:18-19). Her hair was matted and full of mud. (*Id.* at 10:21). She appeared to be dazed and confused. (*Id.* at 11:1).

Trial Court Opinion, 9/25/23, at 4-5.

The trial court summarized Appellant's testimony in his own defense:

[Appellant] testified that he had driven … Kachmarek to West Virginia on June 11, 2020[,] to look at a farmhouse that was [available to rent]. ([N.T., 1/19/23,] at 113:9-13). They were having a good time, listening to music and talking. (*Id.* at 114:4-5). On the way back to M[ount] Pleasant, they stopped at two bars. (*Id.* at 113:9, 114:10). … [A]t the first bar, [Appellant] had a few shots of liquor and some beer. (*Id.* at 114:12-13). At the second bar, … Demarco's, he drank more gin and beer. (*Id.* at 115:13-14). While there, [Appellant] received a phone call from Josh Birrell, who told him that his suspicions that [Kachmarek] had involved [Appellant's] daughter with drug dealers and sex were true. (*Id.* at 115:18-19). During their ride home from Demarco's, [Appellant] confronted [Kachmarek] who,

- 4 -

he claimed, laughed at him in response. (***Id.*** at 116:13-20, 138:1-2). Despite the fact that he was still driving, he began punching her. (***Id.*** at 116:20-23). He was filled with rage when he pulled his truck to the side of the road, put his hands around her neck and choked her. (***Id.*** at 117:16-18).

Although [Appellant] claimed he did not intend to kill Kachmarek, he thought he had done so when he felt her body go limp. (***Id.*** at 16-18). He panicked and pulled her body off of the road, so that no cars would hit her. (***Id.*** at 119:20-21). He left her body there as he drove to Josh Birrell's house. (***Id.*** at 119:24). He and Birrell returned to the scene. (***Id.*** at 120:9-10). [Appellant] stayed in the truck while Birrell checked on Kachmarek. (***Id.*** at 121:3-4). When Birrell returned, he told [Appellant] that Kachmarek was dead. (***Id.*** at 121:22). Birrell said that they needed to obtain a tarpaulin and dispose of her body. (***Id.*** at 122:1). [Appellant] wanted to confess to his mother at that point, but Birrell convinced him not to. (***Id.*** at 122:8-9). Instead, they smoked methamphetamine. (***Id.*** at 122:12-14). After smoking three bowls of the substance, [Appellant] called four individuals … and then his mother, whom he asked to call the police. (***Id.*** at 122:19-24, 123:6-7, 124:1).

Trial Court Opinion, 9/25/23, at 6-7.

On January 20, 2023, a jury convicted Appellant of the above charges, and acquitted him of attempted homicide.[2] The trial court ordered a presentence investigation (PSI) and mental health evaluation. On April 13, 2023, the trial court imposed an aggregate sentence of 9½ to 25 years in prison. The trial court sentenced Appellant to 8½ to 23 years for aggravated assault, with a concurrent sentence of 5 to 10 years for strangulation, and a consecutive sentence of 1 to 2 years for REAP.

---

[2] ***See*** 18 Pa.C.S.A. §§ 901(a) (attempt), 2501(a) (homicide).

Because the aggravated assault sentence exceeded the 20-year statutory maximum,[3] on April 18, 2023, the trial court issued an amended sentencing order. The amended order imposed a sentence of 8½ to 20 years in prison for aggravated assault, a consecutive sentence of 1 to 5 years for strangulation, and a concurrent sentence of 1 to 2 years for REAP. The aggregate sentence, 9½ to 25 years, remained the same. Each sentence was within the standard range of the sentencing guidelines.

On April 23, 2023, Appellant filed a timely post-sentence motion, challenging the sufficiency of the evidence underlying his conviction of aggravated assault. He also argued his sentence was excessive, and requested a modification. On September 25, 2023, the trial court denied the post-sentence motion. On October 19, 2023, Appellant filed a notice of appeal.[4] Appellant and the trial court have complied with Pa.R.A.P. 1925.

---

[3] *See* 18 Pa.C.S.A. § 1103(1) ("a person who has been convicted of a felony [of the first degree] may be sentenced to imprisonment … for a term which shall be fixed by the court at not more than 20 years.")

[4] If a trial court does not decide a post-sentence motion within 120 days, the motion is deemed denied by operation of law. Pa.R.Crim.P. 720(B)(3)(a). The clerk of courts must enter an order deeming the motion denied, and the defendant must appeal within 30 days of that order. *Id.*; *see also id.* 720(A)(2)(b). Here, the 120-day decision period expired on August 21, 2023. However, the clerk of courts failed to enter an order deeming the motion denied. Instead, the trial court entered an order denying the motion on September 25, 2023, and Appellant appealed within 30 days of that order. We have held that a court breakdown occurs when the clerk of courts fails to enter an order deeming a motion denied by operation of law. *See Commonwealth v. Patterson*, 940 A.2d 493, 498-99 (Pa. Super. 2007). *(Footnote Continued Next Page)*

Appellant presents two issues for review:

> 1. Was sufficient evidence presented at trial to establish the crime of Aggravated Assault as charged?
>
> 2. Did the sentencing court abuse [its] discretion in rendering an excessive, illegal[,] and inappropriate sentence which ignored the recommendations of a mental health expert and failed to address the rehabilitative needs of [Appellant]?

Appellant's Brief at 4 (issues reordered).

In his first issue, Appellant challenges the sufficiency of the evidence underlying his conviction for aggravated assault. *Id.* at 18-21. He argues the Commonwealth failed to establish that he caused or attempted to cause serious bodily injury. *Id.* Appellant maintains Kachmarek did not suffer serious bodily injury, asserting she "left the ER after four hours with no fractures and no follow up treatment." *Id.* at 20. Appellant also argues he had access to weapons at the time of the incident, and the fact he did not use them demonstrates his lack of intent to cause serious bodily injury. *Id.* (citing N.T., 1/19/23, at 126 (Appellant's testimony that he had "all kinds of weapons" in his truck, including baseball bats and hammers)). He concedes the evidence established the charge of strangulation, but argues the Commonwealth "pil[ed] on" by charging him with aggravated assault for the same conduct. *Id.* at 20-21.

When reviewing a sufficiency claim, this Court

---

Under the circumstances, we decline to consider Appellant's appeal untimely, and will proceed to consider his substantive issues.

must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Peralta*, 311 A.3d 1, 4 (Pa. Super. 2024) (citation omitted).

A person is guilty of aggravated assault under Section 2702(a)(1) if he

attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life….

18 Pa.C.S.A. § 2702(a)(1). "Serious bodily injury" is defined as

[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

*Id.* § 2301. "For aggravated assault purposes, an 'attempt' is found where the accused, with the required specific intent, acts in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another." *Commonwealth v. Gruff*, 822 A.2d 773, 776 (Pa. Super. 2003). "The intent to cause serious bodily injury may be proven by direct or circumstantial evidence." *Commonwealth v. Matthew*, 909 A.2d 1254, 1257 (Pa. 2006) (citation omitted).

The trial court rejected Appellant's sufficiency claim, reasoning in its opinion as follows:

- 8 -

While choking alone is insufficient to prove specific intent, choking a victim with two hands until she is rendered unconscious, causing bruises and red marks upon her neck, has been found to be sufficient to establish intent to cause serious bodily injury. **See** [***Commonwealth v. Allen***, 281 A.3d 1064, 1107 MDA 2021 (Pa. Super. 2022) (unpublished memorandum at 4)].[5] **See also *Commonwealth v. Watson***, 431 A.2d 949, 952 (Pa. 1981) ("[i]t is beyond question that manual strangulation can result in serious injury, if not death.").

Fortunately, [Appellant's] actions did not cause Kachmarek more serious injur[ies]; however, the manner in which he caused them could easily have had serious or fatal results. Like the [d]efendant in ***Allen***, [Appellant] acted with rage when he struck Kachmarek in the face and pulled her from the truck by her hair. Kachmarek, a woman who was five feet and four inches tall, tried to fight [Appellant] but was no match for [his] over-powering six feet and two inch frame. He did not stop choking her until he felt her body go limp. When she lost consciousness, he hid her body rather than take her to the hospital or call for help. In ***Commonwealth v. Cassidy***, 668 A.2d 1143 (Pa. Super. 1995), the Superior Court held that an intent to inflict serious bodily injuries can be deduced from a defendant's violent conduct and the surrounding circumstances. [***Id.*** at 1145.] That conduct and those circumstances certainly exist in this matter.

Trial Court Opinion, 9/25/23, at 12 (record citations omitted; footnote added).

We agree with the trial court's analysis and conclusion. Viewed in the light most favorable to the Commonwealth, the evidence was sufficient to prove Appellant attempted to cause serious bodily injury to Kachmarek. Accordingly, Appellant's first issue merits no relief.

In his second issue, Appellant argues the trial court abused its discretion by imposing an excessive sentence. Appellant's Brief at 13-18. There is no

---

[5] Pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for persuasive value.

automatic right of appeal from the discretionary aspects of a sentence.

***Commonwealth v. Mastromarino***, 2 A.3d 581, 585 (Pa. Super. 2010). An

appellant challenging the discretionary aspects of a sentence must invoke this

Court's jurisdiction by satisfying a four-part test:

> We conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

***Commonwealth v. Glawinski***, 310 A.3d 321, 325 (Pa. Super. 2024)

(citation omitted). Here, Appellant filed a timely appeal, preserved the issue

in his post-sentence motion, and included the required Pa.R.A.P. 2119(f)

statement in his brief. ***See*** Appellant's Brief at 7-10.

We next consider whether Appellant presents a substantial question. In

determining whether a substantial question exists, we do not

> examine the merits of whether the sentence is actually excessive. Rather, we look to whether the appellant has forwarded a plausible argument that the sentence, when it is within the guideline ranges, is clearly unreasonable. Concomitantly, the substantial question determination does not require the court to decide the merits of whether the sentence is clearly unreasonable.

***Glawinski***, 310 A.3d at 325 (citation omitted). Appellant's Rule 2119(f)

statement asserts the trial court "ignored the mandates of the … Sentencing

Code at 42 Pa.C.S.A. [§] 9721(b), requiring the … trial court to consider the

mental health and rehabilitative needs of the [d]efendant when rendering a

- 10 -

sentence." Appellant's Brief at 10. An appellant's "claim that the sentencing court disregarded rehabilitation and the nature and circumstances of the offense in handing down its sentence presents a substantial question for our review." ***Commonwealth v. Dodge***, 77 A.3d 1263, 1273 (Pa. Super. 2013) Accordingly, we will review the merits of Appellant's claim.[6]

Appellant argues the trial court ignored an expert report recommending that Appellant receive mental health and drug treatment. ***Id.*** at 14-15. He also asserts the court ignored the testimony of his character witnesses, who testified as to his "ability to be rehabilitated," "the lack of danger he would pose upon his release," and "how he has changed…." ***Id.*** at 16. Finally, Appellant maintains the court improperly "rendered a sentence based upon the dramatic and passionate pleas for punishment from a victim[,] who testified in a highly emotional fashion at sentencing…." ***Id.*** at 15.

_____

[6] Appellant's Rule 2119(f) statement also asserts the trial court "overrode" the jury's verdict by sentencing him "in excess of the plea offer on an attempted homicide charge," where the jury had acquitted him of attempted homicide. Appellant's Brief at 9; ***see also id.*** at 10 (describing Commonwealth's pretrial plea offer of 8 to 20 years in prison). However, Appellant fails to cite any legal authority in support of this argument, either as to the substantial question determination or on the merits. ***See id.*** at 9-10, 15-18. Thus, we conclude this aspect of Appellant's claim does not present a substantial question. Moreover, had we reached its merits, we would deem the argument waived for Appellant's failure to cite legal authority. ***See Commonwealth v. Pi Delta Psi, Inc.***, 211 A.3d 875, 883 (Pa. Super. 2019) (when an appellant "cites no pertinent authority to substantiate [his] claim … appellant's issue is waived.") (citing Pa.R.A.P. 2119(a)).

"The standard employed when reviewing the discretionary aspects of sentencing is very narrow." ***Commonwealth v. King***, 182 A.3d 449, 454 (Pa. Super. 2018) (citation omitted).

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias, or ill will, or arrived [at] a manifestly unreasonable decision.

***Commonwealth v. Torres***, 303 A.3d 1058, 1065 (Pa. Super. 2023) (citation omitted).

"In every case in which the court imposes a sentence for a felony … the court shall make as a part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed." 42 Pa.C.S.A. § 9721(b); ***see also Commonwealth v. Mouzon***, 812 A.2d 617, 620-21 (Pa. 2002) (plurality). The Sentencing Code requires the trial court to

> follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

42 Pa.C.S.A. § 9721(b); ***see also Commonwealth v. McClendon***, 589 A.2d 706, 712 (Pa. Super. 1991) (*en banc*) (stating "the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation." (internal citations and quotation marks omitted)). The trial

- 12 -

court must also consider the sentencing guidelines. ***See id.***; ***see also***

***Commonwealth v. Sheller***, 961 A.2d 187, 190 (Pa. Super. 2008) (stating

that "[w]hen imposing a sentence, the [trial] court is required to consider the

sentence ranges set forth in the Sentencing Guidelines….").

Appellant's argument that the trial court ignored his rehabilitative needs

and the testimony of his character witnesses is belied by the record. The trial

court explained the factors underlying its sentencing decision:

> Despite [Appellant's] protestations, the [trial c]ourt did consider his rehabilitative needs and the proposed mitigating factors before imposing the sentence. However, after learning at trial, from the PSI,[7] and from the psychological report of [Appellant's] longstanding history of drug abuse and lack of impulse control, as well as his criminal history and prior acts of domestic violence, the [trial c]ourt concluded that the risk of recidivism with a light sentence was too great. This conclusion was confirmed, not refuted, by the testimony of [Appellant's] own character witnesses, who acknowledged his serious drug problems and change in character when under the influence of drugs. In fact, during his testimony, [Appellant's brother] said that he told [Kachmarek] "not to get with [Appellant]" because of his drug problem.
>
> Appellant argued he needs treatment to address his drug and alcohol issues; however, prior treatments did not help. His mother testified [at sentencing] that rehabilitation did not solve [Appellant's] problems, nor did the therapy offered him as a juvenile. [She stated that during prior incarcerations, Appellant] would mingle with the wrong crowd, meet other addicts, and start using again. Based on all the information provided, the [trial c]ourt had very little confidence that [Appellant] could be rehabilitated. Given the interests of society and the needs of the

---

[7] "We have repeatedly held that where a sentencing court has the benefit of a PSI, the court is presumed to have weighed all relevant information regarding the defendant's character against any mitigating factors." ***Commonwealth v. Mulkin***, 228 A.3d 913, 917 (Pa. Super. 2020)

victim, who is still struggling with the horrific trauma she endured,[8] the [trial c]ourt maintains that the sentence is appropriate.

Trial Court Opinion, 9/25/23, at 14 (record citations omitted; footnotes added); *see also* N.T., 4/13/23, at 59-64 (trial court stating the factors informing its sentencing decision).

The trial court's findings are supported by the record, and we discern no abuse of discretion in its sentencing decision. Appellant's sentences were within the standard range, and our review confirms the trial court considered all relevant sentencing factors. Accordingly, Appellant's second issue merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 07/23/2024

---

[8] Our review of the record discloses no support for Appellant's argument that trial court improperly relied on the victim's "highly emotional" testimony. Appellant's Brief at 15. Though Appellant specifically denies arguing that Kachmarek's "beating was justified," he questions whether the trial court should have sympathized with a victim who "voluntarily participated in a toxic, drug[-]addicted relationship with [Appellant], and who exposed [Appellant's] then 4-year-old daughter to sex videos made at crack houses, fueling the assault at issue." *Id.* at 15-16.